In the Matter of the Accounting of GEROTHMAN W. CORNELL as Assignee of REYNOLDS CARPENTER et al.

An assignee for the benefit of creditors is bound to exercise, in the discharge of his trust, that degree of diligence which persons of ordinary prudence are accustomed to use in their own affairs. This duty extends to all the interest committed to his charge, and his whole conduct in the management of the trust, when called in question, is to be considered in view of the powers which he may exercise in the collection, recovery and application of the assets and the general management of the trust.

Such an assignee may be chargeable with a *devastavit* as well by reason of his neglect as his intentional omission, actual misappropriation or positive fraud.

A negligent omission of the assignee to assail fraudulent transfers of property made by the assignor prior to the assignment, as he is authorized under the act of 1858 (Chap. 314, Laws of 1858), is a breach of trust; and upon an accounting of the assignee under the general assignment act of 1877 (Chap. 466, Laws of 1877), the court has jurisdiction to inquire in respect to the execution of the power conferred by said act of 1858, and subject him to liability for any loss to the assigned estate arising from a culpable neglect to exercise it.

The measure of liability for such neglect is the actual loss sustained, or such as can reasonably be inferred from his misconduct.

Where, therefore, the assignee is chargeable with culpable negligence in not bringing a suit to recover assets so fraudulently disposed of by him, in the absence of proof of actual fraud, wrong-doing or bad faith on his part, he is not chargeable with the sum which might have been recovered unless the estate has lost that amount through his neglect.

Accordingly *held*, where an assignee had been removed upon application of creditors and a new assignee appointed, and upon settlement of his accounts he had been found guilty of negligence in not recovering assets fraudulently disposed of by the assignor, but it did not appear that at the time of his removal the remedy to recover such assets had in any respect been impaired, that a charge against him of the full amount of the claim was error.

Although a trustee may not protect himself against a breach of trust by proof that beneficiaries of the trust might have intervened and prevented it, where they have procured his removal and thereby terminated his power and authority, and the breach consists in the omission to bring an action which may still be brought, they cannot, by refusing or omitting themselves thereafter to act, justly charge him with consequences which, if they had acted with reasonable diligence, might have been prevented.

The assignee had, previous to the assignment, executed certain notes as maker and indorsed others for the accommodation of the assignors, he

receiving certain collaterals as security. These notes had been discounted by a bank which also held securities for them and for other indebtedness of the assignors. Such other indebtedness was sufficient to absorb said securities. The assignee paid the notes after the assignment, reimbursing himself out of the securities in his hands. On the accounting he was charged with the amount of said notes on the ground that he should, upon payment, have claimed, obtained or demanded of the bank an equivalent amount of the collaterals in its hands. *Held*, error; that the bank had the right to require payment from the assignee without surrendering any of its collaterals.

The assignee was charged with an amount collected by J., a son of one of the assignors, upon sundry small accounts appearing on the books of the assignors. The schedules showed a debt to J. for more than the amount collected, and it appeared that the assignors, before the assignment, executed to J. a written assignment of said book accounts as security for his claim. *Held*, that the charge was error.

The assignee paid certain taxes on real estate of the assignors, upon which were mortgage incumbrances to much more than the value of the property, a third mortgage being held by the assignee. *Held*, that a credit for the amount so paid was properly disallowed.

Certain securities had been transferred to creditors as collateral security by the assignors before their assignment. After payment from said securities of the debts secured there remained a surplus, which it was found the assignee allowed a third person to collect and appropriate without authority. *Held*, that the assignee was properly charged with the amount.

*In re Carpenter* (45 Hun, 552) reversed in part.

(Argued April 24, 1888; decided October 2, 1888.)

APPEAL from order of the General Term of the Supreme Court in the third judicial department, made May 5, 1887, which modified, and affirmed as modified, an order of Special Term settling the accounts of Gerothman W. Cornell, as assignee under an assignment for the benefit of creditors, executed March 17, 1876. (Reported below, 45 Hun, 552.)

On the petition of creditors of the assignors an order was granted December 6, 1880, removing said assignee and appointing another in his place. Prior to such order Cornell had made application for a final accounting. The matter was referred to a referee, and on the coming in of his report, the Special Term order was made.

The further material facts appear in the opinion.

*R. A. Parmenter* and *Edgar L. Fursman* for appellant. The power conferred upon an assignee by chapter 314, Laws of 1858, to impeach prior conveyances or transfers, must be exerted through an appropriate action brought by the trustee against the alleged transferrees for that purpose. (*Southard* v. *Benner*, 72 N. Y. 424, 427; *Hard* v. *Milligan*, 8 Abb. N. C. 65.) The claimants, under the previous transfers, were not before the referee, and could not have been properly made parties for that purpose in the accounting. (*Levy's Accounting*, 1 Abb. N. C. 177, 178, 186.) Under the statute of frauds the prior assignments would have been legal and valid instruments, unless made with intent to hinder, delay or defraud the creditors of the assignors. (2 Edm. Stat. Titles 2 and 3, 138, 143.) The trustee must have come into the possession and control of the property before equity will exact from him such large measure of responsibility. (*In re Holbrook*, 99 N. Y. 539; *In re Witmer*, 40 Hun, 64.) The several allowances by way of interest upon uncertain or imaginary principal sums are in violation of law. (*McMahan* v. *N. Y. & Erie R. Co.*, 20 N. Y. 469; *White* v. *Miller*, 78 id. 396; 71 id. 134; *Day* v. *N. Y. C. R. R. Co.*, 22 Hun, 418.) The remedy for the pretended grievance on the part of the new assignee and of Bliss & Allen, as judgment creditors, was by a proper action brought in a court of equity, and not in an accounting against the assignee who had been removed. (*In re Raymond*, 27 Hun, 508; *Gardner* v. *Gardner*, 7 Paige, 115; *Kyle* v. *Kyle*, 67 N. Y. 408; *Brownell* v. *Curtis*, 10 Paige, 210.) Previous transfers of property by the assignors, however fraudulent, could not be attached, replevined or recovered by the general assignee in an action or proceeding at law. (*McQueen* v. *Babcock*, 41 N. Y. 337.) Nor could the creditors call the general assignee to account for the value of such property or for the property itself until the fraudulent title had been removed. (*Coates* v. *First Nat. Bk. of Emporia*, 91 N. Y. 20, 31; *Hopkins* v. *Banks*, 7 Cow. 650; *Osborn* v. *Thomas*, 46 Barb. 514.) The legal presumption is that the transfers (now alleged to be fraudulent) were valid,

being sufficient in form, and the law never presumes concerning an assignment of a chose in action that it was fraudulent or without consideration. (*Belden* v. *Meeker*, 47 N. Y. 307, 311; *Eno* v. *Crook*, 10 id. 60.)

*E. Countryman* and *James Lansing* for respondents. Cornell, as general assignee, "was a voluntary trustee," not acting gratuitously, and hence he was bound to exercise the diligence required of a paid agent or of a provident owner, and he was liable for ordinary negligence, or the want of that degree of diligence which persons of ordinary prudence are accustomed to use about their own business and affairs. (*In re Dean*, 86 N. Y. 398, 400; *Litchfield* v. *White*, 7 id. 438, 444; *Earle* v. *Earle*, 93 id. 104, 113; *Harrington* v. *Keteltas*, 92 id. 40, 45, 49; *Baskin* v. *Baskin*, 4 Lans. 90, 94; *Wise* v. *Murphy*, 5 Redf. 365; 2 Pomeroy's Eq. Jur. §§ 1066, 1067, 1070, 1079, n. 21; *Schultz* v. *Pulver*, 3 Pai. 182; affirmed, 11 Wend. 361.) Where a trustee permits a third party to manage and control the estate he adopts him as his agent, is responsible for his conduct and liable for losses occasioned by his improper or negligent acts and omissions of duty. (*Harrington* v. *Keteltas*, 92 N. Y. 40, 46, 49; *Cook* v. *Lowry*, 29 Hun, 21, 28, 29; *Manning* v. *Stern*, 1 Abb. N. C. 409; *Clapp* v. *Clapp*, 10 State Rep. 733, 738; *Earle* v. *Earle*, 93 N. Y. 104, 111, 113; *Adair* v. *Brimmer*, 74 id. 541, 564; *Wilmerding* v. *McKesson*, 103 id. 329; *Brown's Accounting*, 16 Abb. [N. S.] 457; *Schultz* v. *Pulver*, 11 Wend. 365, 366; *Hollister* v. *Burritt*, 14 Hun, 291; 2 Pomeroy's Eq. Jur. § 1068.) The right to enforce this liability in the proceeding for an accounting is expressly recognized in the statute relating to voluntary assignments for the benefit of creditors. (Laws of 1877, Chap. 466, §§ 23, 25, § 20, subds. 1, 2, 3, 4 and 9; Laws of 1885, chaps. 380, 464, § 1; *Winn* v. *Crosby*, 52 How. 174, 178; *In re Dean*, 86 N. Y. 398; *Hollister* v. *Barrett*, 14 Hun, 291; *Wetmore* v. *Porter*, 92 N. Y. 76.) Where securities are hypothecated, the legal title or general owner-

ship remains with the pledgor, and only a special property passes to the pledgee. (*Cortelyou* v. *Lansing*, 2 Caine's Cases, 200 ; *Wheeler* v. *Newbold*, 16 N. Y. 392, 398 ; *Farwell Case*, 90 id. 483, 488, 489 ; 2 Kent's Com. 581 ; 2 Parsons on Con. 112, note *a*, 113.) It may be sold under execution, subject to the special lien of the pledgee. (*Stief* v. *Hart*, 1 N. Y. 20 ; *Truslow* v. *Putnam*, 4 Abb. Dec. 425 ; *King* v. *Van Vleck*, 40 Hun, 68.) Under the circumstances, the estate being insolvent, the assignee had not only the right, but it was his duty, to disaffirm the assignments and recover the property for its benefit. (Laws of 1858, chap. 514; *Bate* v. *Graham*, 11 N. Y. 237 ; *Southard* v. *Benner*, 72 id. 427 ; *Lichtenburg* v. *Herdtfelder*, 103 id. 306 ; *Ball* v. *Slafter*, 98 id. 622.) The assignee alone could maintain such action. (*Spring* v. *Short*, 90 N. Y. 538, 544 ; *Crouse* v. *Frothingham*, 97 id. 106.) Even if a debt is doubtful, a trustee, with notice, is bound to active diligence for its collection, and must proceed without waiting, for the request of the *cestui que trust ;* and if the case is one of such doubt that an indemnity is proper, he must, at least, ask for it, and, at any rate, he takes the risk of showing the debt is not lost by his own negligence. (*Harrington* v. *Keteltas*, 92 N. Y. 40 ; *Hollister* v. *Burritt*, 14 Hun, 291 ; *Pingree* v. *Comstock*, 18 Pick. 46.) Such gross negligence or positive bad faith, as would justify the removal of an assignee, would equally justify a redress of the injury in the adjustment of his accounts. (*Haight* v. *Brisbin*, 100 N. Y. 219–222 ; *In re Cohen*, 78 id. 248.) The inventory is *prima facie* evidence of the amount and value of the property belonging to the estate, and the burden is upon the assignee to show it is incorrect if he wishes to lessen his responsibility. (Redf. Sur. [2d ed.] 422 ; *Underhill* v. *Newburger*, 4 Redf. 500 ; Kerr on Fraud and Mistake, 151, 182 ; *Pomeroy* v. *Benton*, 77 Mo. 65, 84–88 ; *Heath* v. *Waters*, 40 Mich. 458, 471 ; *Walrod* v. *Ball*, 9 Barb. 271.)

ANDREWS, J. We have examined with care the complicated and perplexing details of evidence on the accounting contained

in the voluminous record before us, and its perusal has left a strong impression that a strained construction has been placed by the referee upon many facts and circumstances upon which he has relied to charge the defendant with liability. This court is bound by the findings of the referee upon the facts, so far as they are supported by evidence, and have been confirmed by the General Term. But we are of opinion that errors were committed by the referee, both in respect to facts found, and, in some cases, in his legal conclusions. The fact is undisputed that the whole amount of money realized by the assignee from the assigned estate was $7,004.83. The referee charged him on the accounting with the sum of $71,132.62, principal and interest, mainly on the ground of negligence in not getting in assets which the referee found he might have collected, and for not taking prompt measures to recover assets which, it is alleged, had been fraudulently transferred by the assignor before the assignment. The General Term modified the report of the referee in two respects, reducing the judgment against Cornell to $58,439.71, and, as so modified, confirmed the report.

It must be admitted that the evidence discloses many things in the conduct of the assignee in the management of the trust, which exposes him to just criticism. The absence of accurate business methods, his failure to make himself fully acquainted with the condition of the assigned estate, and to collect the surplus on insurance policies transferred by the assignors as collateral before the assignment; his omission to take possession of the books of the firm of which he was assignee, or to keep accurate accounts of his proceedings in the trust; his relations with Hiland Carpenter, a son of one of the assignors, and other circumstances disclosed, justify a rigid scrutiny of his conduct, and, in case of doubt created thereby, an adverse conclusion. But in every such case there is danger of injustice, against which it is necessary to guard, and to see that considerations, such as we have mentioned, are given only their legitimate influence. The referee refused to find that the assignee was guilty of actual fraud. but made findings in numerous instances of gross negligence,

Most of the charges constituting the large aggregate liability adjudged against Cornell were based upon his acts or omissions in respect to the item of $94,118.16, in the schedule of assets prepared and verified by the assignors, and filed with the assignment March 31, 1876. This item is designated in the schedule, "insurance receivable," and was the adjusted value of insurance policies on the mill of the assignors, and the stock and materials therein January 18, 1876, when the mill and its contents were destroyed by fire. The adjustment of the loss had been made prior to the general assignment to Cornell, which bears date March 17, 1876, and the adjusted amounts were payable in a short time thereafter, and were, in fact, mainly paid by the insurance companies in April and May of that year. This item of $94,118.16 was the only asset of much value belonging to Carpenter & Co. at the time of the assignment. But it appeared by the schedule of liabilities, prepared and verified by the assignors and filed with the schedule of assets March 31, 1876, that of these insurance policies an amount aggregating in face value $92,537.93, of the adjusted value of $79,004.25, had been assigned by the assignors to creditors as collateral security prior to their general assignment, the amount assigned to each creditor named in the schedule being stated in connection with the description of the particular debt. The obligations of an assignee for creditors are those which appertain to voluntary trustees, not acting gratuitously, without compensation. They are bound to exercise that degree of diligence which persons of ordinary prudence are accustomed to use in their own affairs. This duty extends to all the interests committed to his charge, and his whole conduct in the management of the trust, when called in question, is to be considered in view of the powers which he may exercise in the collection, recovery and application of the assets and the general management of the trust. He may be chargeable with a *devastavit* as well by reason of his neglect as his intentional omission or actual misappropriation or positive fraud. The law exacts not only good faith but reasonable care and due diligence

(*Litchfield* v. *White*, 7 N. Y. 438; *Matter of Dean*, 86 id. 399; 2 Pom. Eq. Jur. § 1066), and he is liable for any loss resulting from a breach of duty to those interested in the assignment.

It will be convenient to consider *seriatim* the items charged against the assignee by the referee in his report:

(1.) The referee charged Cornell with the sum of $8,282.58, and interest thereon, the amount of insurance moneys not appearing by the schedules to have been transferred by the assignors prior to the assigment, which, as the referee found, Cornell permitted to be collected by and paid to other persons, whereas they should have been collected by him and distributed as a part of the general assets. This charge was stricken out by the General Term, and no appeal was taken by the creditors or the new assignee from the General Term judgment, and the record is therefore conclusive that this item was improperly allowed by the referee.

(2.) The ninety-ninth item in the schedule of debts is as follows: "J. L. Carpenter, Bennington, Vt., $29,586,76, on promissory notes for money received by us at Pownal, Vt., the same being partly secured by insurance policies amounting to $21,000." J. L. Carpenter was a brother of the assignors. It was claimed on the accounting, and proof was given tending to show, that the alleged debt was fictitious and fraudulent, except as to the sum of $6,000 or thereabouts, and the referee so found. The fact that policies of insurance to the amount stated in the schedule were transferred by the assignors to J. L. Carpenter, prior to the assignment, was undisputed. The written assignment, describing the policies, dated January 24, 1876, was produced. It also appeared that the adjusted amount of these policies was collected of the insurance companies by Hiland Carpenter, as agent for J. L. Carpenter, on or prior to May 15, 1876, and paid by him to J. L. Carpenter, from whom, as Hiland testified, he received the policies for collection. The alleged debt to J. L. Carpenter was represented by ten notes signed "R. & A. P. Carpenter," nine dated October 30, 1873, and one November 3, 1873;

and it was claimed that they were given for an indebtedness of the assignors contracted in Vermont in or prior to 1862, before the firm of R. Carpenter & Co. was formed, which latter firm commenced business at Hoosack, in this State, in 1872. There was no entry of the debt in the books of R. Carpenter & Co., except an entry in the back part of a bill book of four notes, amounting to $5,000 or $6,000, given, as one Markham testified, on a settlement between J. L. Carpenter and his brothers in the fall of 1873, and which, as the witness further testified, represented the whole indebtedness then owing by them to J. L. Carpenter. The referee charged Cornell with the sum of $10,907.35, principal, and $5,095.35, interest thereon, from September 1, 1876, the principal sum being the excess collected on the insurance policies assigned to J. L. Carpenter over and above his actual *bona fide* debt as found. The referee in his report, after finding that the debt to J. L. Carpenter, stated in the schedule, was false and fictitious, except as to the sum of $5,000 or $6,000, proceeds to state the liability of Cornell as follows: " The assignee, Cornell, knew, or, with proper diligence, could or should have known what did and did not appear on the books of R. Carpenter & Co., but he made no examination or inquiry into the matter, either with reference to the claim of Lyman Carpenter (J. L. C.), or of the transfer to him of said insurance policies. He permitted Hiland Carpenter, without objection, to collect and receive the money on all of said policies, amounting to $17,907.35, and to divert a large portion of the same from the uses and purposes of said trust estate." We are of opinion that upon the evidence, in respect to this transaction and the conduct of Cornell, he was not guilty of culpable negligence in the first instance, in permitting J. L. Carpenter to collect and receive the insurance money under his assignment of the policies. The policies were, in fact, assigned to J. L. Carpenter, prior to the general assignment to Cornell. The adjusted amount of the insurance was collected by J. L. Carpenter within a few weeks thereafter. It is not claimed, or, at least, there is no evidence that prior to the collec-

tion of the insurance by J. L. Carpenter, Cornell had any knowledge or notice that the debt, mentioned in the schedule, was not valid to the full amount. The entry in the back part of the bill book, which, so far as apears, was simply a memorandum of four notes, if it had come to the knowledge of Cornell, would not have disclosed the alleged fraud. The schedule of debts was verified by the assignors in conformity with the statute, and we think the assignee, in the absence of other information or notice, had the right to assume that the schedule was correct. The decision of the referee is sought to be supported on the additional ground, that as the assignee had notice as early, at least, as the time of the filing of the petition for his removal in the fall of 1878, that the alleged debt to J. L. Carpenter was fictitious and fraudulent, his omission thereafter to bring suit to set aside the assignment of the policies, and recover the money collected by him beyond the amount of his actual debt, rendered Cornell liable for the sum which might have been recovered, as though such recovery had, in fact, been had. Under the act chapter 314 of the Laws of 1858, an assignee for creditors, under a general assignment, may assail fraudulent transfers of property made by the assignor prior to the assignment, by action to set them aside. (*Southard* v. *Benner*, 72 N. Y. 424; *Ball* v. *Slaften*, 98 id. 622; *Lichtenberg* v. *Herdtfelder*, 103 id. 306.) Nor do we entertain any doubt that it would be his duty so to do in a proper case, and that his negligent omission of this duty would constitute a breach of trust. (*In re Cohn*, 78 N. Y. 248.) We are further of opinion that on an accounting by an assignee under the general assignment act of 1877, the court has jurisdiction to inquire as to the conduct of the assignee, as to every matter involved in the execution of his trust, and as well in respect to the execution of the power conferred upon him by the act of 1858 as other things, and to subject him to liability for any loss to the assigned estate resulting from a culpable neglect to exercise the power conferred by that act. But for such neglect the measure of liability is the loss

sustained. Assuming that Cornell was negligent in not insti-
tuting a suit against J. L. Carpenter, he is not chargeable with
the sum which might have been recovered therein unless the
estate has lost that amount through his neglect. Upon prin-
ciple and in justice a recovery against him for the neglect
should be restricted to the actual loss, or such as may reason-
ably be inferred was occasioned by his misconduct. There
is no direct evidence, nor any we think, from which an
inference could properly be drawn that the omission of
Cornell to bring suit against J. L. Carpenter subjected the
estate to the loss of the claim. Cornell was removed as
assignee of the court upon application of creditors and a new
assignee appointed in his place by order of the court June
8, 1880. He was from that time divested of all interest and
power as assignee, and could not thereafter prosecute any suit
against Cornell. The new assignee succeeded to all rights
before vested in Cornell. It does not appear that the remedy
to recover any sum improperly received by Carpenter was at
that time in any respect impaired. He could not protect
himself under the statute of limitations, for more than eighteen
months remained during which an action might have been
brought. Nor is there any evidence that, by reason of insol-
vency or other cause, the remedy might not have been pur-
sued as advantageously after the appointment of the new
assignee as before. In short, the omission of Cornell to bring
an action was not shown to have resulted in the loss with
which he was charged. Even before the removal of Cornell
the creditors might have brought an action in case he had
refused to prosecute, joining the assignee as a party. The
same remedy was open to them and to the new assignee after
that time. It is true that a trustee cannot protect himself
against a breach of trust by proof that the beneficiaries
of the trust might have intervened and prevented it. But
when they have procured the removal of a trustee, and
thereby terminated his power and authority, and the breach
of trust consists in his omission to bring an action, which may

still be brought, they cannot, by refusing or omitting themselves to act, justly charge the former trustee with consequences which, if they had acted with reasonable diligence, might have been prevented.

(3.) The referee charged Cornell with the principal sum of $2,139.04, and interest thereon, $909.78, the principal sum being the amount collected by Hiland Carpenter on a policy issued by the Fire Association of Philadelphia. This was one of the policies assigned to J. L. Carpenter. It would seem that the referee allowed a double recovery in this case. The money collected on this policy was charged against Cornell; first, in charging him with the amount collected by J. L. Carpenter on insurance policies assigned to him over and above his actual debt, and, second, in recharging the sum collected on the policy as an independent item. The liability of Cornell for this item is governed by the same considerations to which we have adverted in considering the second item; and, as the case stands, the charge was, we think, erroneous.

(4.) The referee charged Cornell with the amount of two notes, executed by him as accommodation maker for the assignors, discounted and held by the National Exchange Bank of Troy, one for $1,180.62, dated October 12, 1875, and the other for $1,875, dated November 23, 1875, and also with the amount of two notes, indorsed by him as accommodation indorser for the assignors, also discounted and held by the same bank, one for $2,397.50, dated October 9, 1875, and the other for the same amount, dated October 19, 1875. These notes were paid by Cornell to the bank soon after the assignment. The amount of these notes, with interest, aggregating $11,713.97, was charged against Cornell by the referee, on the ground that the notes were doubly secured, first by insurance policies held by the bank, and again by policies held by Cornell; and that Cornell, when he paid the notes repaid himself out of proceeds of policies held by him, without claiming, obtaining or demanding of the bank the surrender of an equivalent amount of the collaterals which it held. It is quite manifest that if the bank held the collaterals not only for these notes, but

for other indebtedness of the assignors sufficient to exhaust them, it could require payment from Cornell of the paper of which he was maker or indorser, and would be under no obligation to surrender any of the collaterals. The bank debt is stated in the schedule to be $15,465.80, and was secured by the Walker mortgage for $10,000, and by insurance policies of the face value of $10,000. It was not shown nor is it found that the amount of the bank debt was not accurately stated in the schedule. The Walker mortgage is still held by the bank and nothing has been collected on it, and the evidence is that it had no value. The insurance policies held by the bank, the adjusted value of which was $8,510.62, were, so far as appears, the only available security (outside of the paper itself) held for a debt of $15,465.80. Cornell was himself a creditor of the assignors, and his contingent liability on paper, made and indorsed for their accommodation, amounts, as appears by the schedule, to $16,125.45. He held insurance policies of the adjusted value of $8,953.81, and a $5,000 mortgage as his security. Apparently, the bank debt, over and above the amount paid by Cornell, exceeded the value of all the collaterals held by the bank. The bank was not bound to surrender them until the whole debt was paid; and Cornell, having paid the notes upon which he was liable, was entitled to apply the securities held by him for his reimbursement. We are unable to perceive any just reason for charging Cornell with the liability in question.

(5.) The referee charged Cornell with the sum of $2,139.05, principal, and $912.25, interest, the principal sum being the adjusted value of a policy issued by the St. Paul Insurance Company, and which had been assigned to the National Exchange Bank of Troy, as collateral security, before the execution of the general assignment. It seems that Cornell, after the assignment, to facilitate the collection, assented to the payment of the adjusted value of the policy to the bank. The referee based this charge on the ground that Cornell gave this consent " without inquiry or effort to ascertain the state of the accounts and dealings between said bank and said

assignors, and he allowed the bank to appropriate to its own use, although he had paid several thousand dollars to said bank himself upon indebtedness secured by the same collaterals." We think this charge was erroneous for the reasons stated in respect to the items last considered.

(6.) The referee charged Cornell with $5,020.79, principal. and $2,445.42, interest, on account of three notes on which he was an accommodation indorser for the assignors, two held by banks and one by one Robinson, and which he paid after the assignment, and as, is inferable from the evidence, after suit brought thereon. The ground upon which the referee based this charge was " that one George Barker was first indorser and held collateral securities, the said assignee misappropriating, for the purpose (of paying the notes), the proceeds of insurance policies held in his hands as collaterals." The schedule shows a debt to George Barker of $13,496.48, for wool and accomodation indorsements. It appeared in evidence that he held insurance policies, as collateral, of the face value of $11,000, of the adjusted value of about $9,350. We are not satisfied that the finding of the referee, that Cornell misappropriated proceeds of insurance policies in his hands in the payment of these notes, is supported by the evidence. Some of the considerations stated in regard to the charge growing out of the payment of the notes to the National Exchange Bank are relevant to this item also.

(7.) The referee charged Cornell with the proceeds of a policy paid to Jewett, a creditor, and also with the value of a policy in the Lycoming Insurance Company. The evidence upon which these charges are based is very uncertain and unsatisfactory.

(8.) The referee charged Cornell with the sum of $1,000 and interest thereon, being the amount collected and received by J. N. Carpenter, a son of one of the assignors, on sundry small book accounts on the books of the assignors. The schedule shows a debt to J. N. Carpenter, for services, of $1,628, but makes no mention of collaterals. There was evidence that the assignors made a written assignment of the accounts to J. N.

Carpenter as security, prior to their general assignment, which was exhibited to Cornell. It was not shown that the debt was fictitious, nor was the fact that there had been a written assignment of the accounts contradicted, nor was it shown that Cornell had any reason to question the validity of the debt or of the assignment of the accounts.

(9.) Cornell, as has been stated, collected and received as assignee the sum of $7,004.83. He was charged by the referee with the sum of $3,969.04, as the principal sum remaining in his hands beyond disbursements, and, with interest thereon, making an aggregate of $5,397.88. The only question raised in respect to the item arises on the claim that Cornell should have been allowed as a disbursement the sum of $473.95 for taxes and interest paid on account of the mill property, on which Cornell held a third mortgage of $5,000, the incumbrances being much more than the value of the property. We think the referee, under the circumstances disclosed, properly disallowed this credit.

(10.) The judgment of the referee, as modified by the General Term, charges Cornell with $2,646.83, with interest, the amount of surplus remaining on certain insurance policies assigned to creditors of the assignors before the assignment, as collateral security for their debts, and which surplus was collected and appropriated without authority by Hiland Carpenter, with, as is found, the consent of the assignee. We think the assignee was justly chargeable with this item. (*Shultz* v. *Pulver*, 3 Paige, 182; *S. C.*, 11 Wend. 361.)

We are of opinion that radical errors were committed by the referee on the accounting to the prejudice of the defendant. The judgment should be reversed and the case remitted to the Supreme Court for such further proceedings as may be directed, unless the respondent consents to take judgment for the items numbered 9 and 10 in the opinion, in which case the judgment, as so modified, should be affirmed.

All concur.

Ordered accordingly.